FILED

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

98 APR 17 PM 12: 21

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

APR 1 7 1998

TAURUS EXPLORATION, INC.,              )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )    CIVIL ACTION NO. 96-G-3296-S
                                       )
OPPENHEIMER & COMPANY, INC.,           )
                                       )
          Defendant.                   )

MEMORANDUM OPINION

This cause is before the court upon the motion of Oppenheimer & Company, Inc.

("Oppenheimer") for summary judgment. The motion has been extensively briefed and is now

ripe for decision.

I.

FACTUAL SUMMARY

Taurus Exploration ("Taurus"), as part of its oil and gas exploration business,

engages in futures trading in those commodities. In April, 1993, Taurus entered into a

Commodity Account Agreement with Oppenheimer. The account was a nondiscretionary

account. With that type of account, the broker is authorized to make trades only upon specific

instructions from the principal. In other words, Oppenheimer was only to make trades at the

specific direction of Taurus, rather than exercising its discretion as to whether or not to make

54

trades. This action arises out of allegedly unauthorized trades made by Oppenheimer in Taurus's

account. For the purposes of ruling on Oppenheimer's motion for summary judgment only, the

court will assume that all of the trades in question were not authorized by Taurus prior to the

time they were made.[1] Therefore, references to "unauthorized trades" should not be considered

as an expression of opinion by the court concerning whether or not the trades were in fact

authorized prior to the time they were made.

The unauthorized trades identified by Taurus in its complaint span a period from

January 3, 1996, to September 24, 1996. Taurus also alleges that an unauthorized trade on

October 3, 1996, was substituted for an authorized trade on October 9, 1996, and that price

discrepancies related to authorized trades generated losses in its account. There is no evidence in

the record indicating that Taurus notified Oppenheimer of any allegedly unauthorized trades or

price discrepancies prior to September 1996.

Oppenheimer argues that all of Taurus's complaints regarding unauthorized trades

are precluded because of Taurus's failure to comply with the notice requirements of the

Commodity Account Agreement. Specifically, Oppenheimer argues that the notice provision of

the printed form account agreement (which requires that notice of any objection by the principal

be given within two days in the case of daily confirmations of trading activity (hereinafter "daily

confirmation slips"), and within ten days in the case of monthly account statements) prevents

Taurus from challenging the disputed trades. Taurus, however, argues that the provision relied

upon by Oppenheimer is not part of the account agreement between it and Oppenheimer.

---

[1] Oppenheimer does not concede that the trades in question were not authorized prior to
the time they were made.

II.

## THE TERMS OF THE CONTRACT BETWEEN TAURUS AND OPPENHEIMER

### A.    THE FORMATION OF THE CONTRACT

Although the parties differ widely in their interpretation of the Commodity

Account Agreement, the facts surrounding its execution are not in dispute.  After receiving a

form "Commodity Account Agreement" from Oppenheimer, officers at Taurus reviewed the

agreement and struck printed portions of that form.  One of the provisions Taurus struck

provided as follows:

> All communications so sent by whatever method, will be deemed received
> personally by you at the time so sent whether actually received or not and you
> agree to waive all claims resulting from failure to receive such communications.
> Any report of execution or statement of account rendered by Oppenheimer to you
> may be objected to by you only if you give written notice of the objection to
> Oppenheimer within two (2) days in the case of reports of executions, and within
> ten (10) days in the case of statements of account.

(Woodruff Aff. Ex. A (emphasis added).)  Taurus also struck a provision of the form agreement

providing that New York law would apply to the "construction, validity and performance" of the

agreement.

The modified form was mailed along with a cover letter to William Knochel,

Oppenheimer's account representative in Atlanta who was to service Taurus's account.  The text

of that letter is as follows:

> Enclosed are the documents to open a Taurus Exploration, Inc. account.  You
> should note that as we discussed, the Taurus Board resolution authorizing the
> account does not follow the Oppenheimer form.  In addition, I have marked
> certain changes to the Account Agreement.  Please call me if there is a problem
> with any of these changes.

3

(Woodruff Aff. Ex. B (emphasis added).)  The modified form was apparently forwarded by

Knochel to the administrative offices of Oppenheimer in New York for approval.  Sometime

thereafter an account was opened and trading commenced.  There is no evidence in the record

tending to show that Oppenheimer responded to the above cover letter.

Oppenheimer argues that Taurus's attempt to strike the above provisions was

ineffective because of the following provision contained in the printed form:

> (e)  This Agreement shall not be effective until accepted by an authorized officer
> of Oppenheimer.  No amendment to this Agreement shall be effective unless
> reduced to writing and signed by both you and an authorized officer of
> Oppenheimer.  <u>No alteration to the printed provisions of this Agreement will be
> effective unless initialed by an authorized officer of Oppenheimer,</u> and no margin,
> commissions, costs, fees, service charges, premiums or other charges may be
> waived except in writing signed by an authorized officer of Oppenheimer.  This
> Agreement, and all accompanying documents, embody the entire agreement of the
> parties, superseding any and all prior agreements and there are no other terms,
> conditions or obligations other than those contained herein.

(Emphasis added).  There is no evidence that the alterations made by Taurus were so initialed.

Oppenheimer, therefore, argues that the attempt by Taurus to strike the notice provision of the

agreement was ineffectual.  Taurus, however, argues that because Oppenheimer did not notify it

of any objection to the modifications it had made, the act of opening an account constituted an

acceptance of the agreement as modified.

## B.   CHOICE OF LAW

The first question that must be answered is which state's law governs the

interpretation of the agreement.  Federal courts sitting in diversity apply the choice of law rules

of the forum state.  <u>Klaxon Co. v. Stentnor Elec. Mfg. Co., Inc.</u>, 61 S. Ct. 1020, 1021-22 (1941).

Alabama courts follow the traditional principle of <u>lex loci contractus</u> in determining what law to

4

apply. Under that rule, "a contract is governed as to its nature, obligation, and validity by the law of the place where it was made, unless the parties intend the law of some other place to govern, or unless it is to be wholly performed in some other place." Ex Parte Owen, 437 So. 2d 476 (Ala. 1983). The contract between Taurus and Oppenheimer came into being when the modified form agreement was accepted by Oppenheimer. That event occurred either in Georgia, where Knochel received the modified agreement, or New York, where the final approval and administrative steps necessary to open Taurus's commodity trading account took place. Therefore, either Georgia or New York law governs the interpretation of the contract between Taurus and Oppenheimer.

### C.   TAURUS'S CHANGES CONSTITUTED A COUNTEROFFER.

Under either Georgia or New York law, the modifications  Taurus made to the printed form agreement together with its letter to Oppenheimer constitute a counteroffer. See e.g., Tencza v. Hyland, 171 A.D.2d 1057, 569 N.Y.S.2d 242, 243 (N.Y.A.D. 4 Dept., 1991)("Defendants' material alterations of plaintiffs' offer to purchase constituted a counteroffer that required plaintiffs' acceptance to form a binding contract."); Duval & Company v. Malcom, 214 S.E.2d 356, 358 (Ga. 1975)(acceptance purporting to modify terms of offer constitutes a counteroffer, which if not accepted by original offeror, results in no contract). Therefore, Oppenheimer's contention that Taurus is bound by the provisions it struck from the contract is untenable. The changes in the printed form made by Taurus are material and clearly constitute a counteroffer rather than an acceptance.

Equally untenable is Oppenheimer's contention that Taurus's actions manifested an intention to accept the terms it struck from the agreement should Oppenheimer fail to accept the proposed changes. This argument is based upon the fact that Taurus failed to strike the provision of the form agreement providing that "[n]o alteration to the printed provisions of this Agreement will be effective unless initialed by an authorized officer of Oppenheimer." Oppenheimer suggests that "Taurus thus **expressly agreed** that its modification attempt would be invalid UNLESS initialed by an authorized officer at Oppenheimer" (Oppenheimer' Reply Brief, at 12 (emphasis in original).) Oppenheimer's argument concerning the no alteration clause ignores the fundamental axiom of contract law, which requires that there be a "meeting of the minds" or manifestation of mutual assent in order to create a binding contract. Taurus cannot reasonably be found to have assented to the terms it struck from the printed form. The letter sent to Oppenheimer along with the modified Commodity Account Agreement makes it clear that Taurus was not agreeing to the terms it struck from the printed form. The letter calls attention to the changes Taurus made to the printed form and, rather than indicating its assent to the language of the printed form should Oppenheimer decline to accept those changes, requests that it be informed if the changes were not acceptable.[2] No reasonable jury could find that Taurus's actions constituted a manifestation of its assent to the terms it struck should Oppenheimer not agree to the changes.

---

[2] "In addition, I have marked certain changes to the Account Agreement. Please call me if there is a problem with any of these changes."

6

### D.   OPPENHEIMER ACCEPTED TAURUS'S COUNTEROFFER.

That Oppenheimer accepted the counteroffer made by Taurus cannot be
questioned. Because Oppenheimer does not concede that a counteroffer was made, it does not
argue that it rejected Taurus's counteroffer. If it had rejected the counteroffer, no express
contract would have come into being. In that event, the express notice provision relied upon by
Oppenheimer would not be binding upon Taurus. Oppenheimer's attention was called to the
proposed changes by the letter sent with the modified printed form. Additionally, the struck
provisions were on the last page of the printed form, just above the signatures of the officers at
Taurus who approved the agreement. In order to verify that the appropriate officers of Taurus
had signed the agreement, Oppenheimer would have had to have noticed the changes made by
Taurus.

It is not necessary to consider whether Oppenheimer's silence in light of these
facts was by itself sufficient to constitute acceptance of Taurus's counteroffer. Oppenheimer did
not merely remain silent, it opened an account and began executing trades at Taurus's direction.
This, without question, operated as a manifestation to Taurus of Oppenheimer's consent to the
changes made by Taurus to the form agreement.[3] These actions could not reasonably be
interpreted as a rejection of Taurus's counteroffer, or as an insistence upon the struck portions of
the printed form. Under both Georgia and New York law, performance may constitute
acceptance. See e.g., McIntosh v. Niederhoffer, Cross & Zeckhouser, Inc., 106 A.D.2d 774, 483

---

[3] At this juncture it should be noted that Oppenheimer's actions would amount to a
waiver of the no alteration provision even if that provision were interpreted to prohibit changes
to the form agreement. Its actions in opening the account in spite of the changes made to the
form agreement and in spite of Taurus's letter pointing out those changes, evidence a clear intent
to waive the no alteration provision of the printed form.

N.Y.S.2d 807, 809 (1984)("By commencing performance after receipt of the amended fee

arrangement, defendant indicated its acceptance."); Valiant Steel & Equip.,Inc. v. Roadway

Express, Inc., 205 Ga. App. 237, 240, 421 S.E.2d 773, 776 (1992)("If one of the parties has not

signed, his acceptance is inferred from a performance under the contract, in part or in full, and he

becomes bound.")(quoting Cooper v. G.E. Constr. Co., 116 Ga. App. 690, 694(2), 158 S.E.2d

305 (1967)). By its performance Oppenheimer manifested its assent to the counteroffer of

Taurus. No reasonable jury could find Oppenheimer's actions did not represent a manifestation

to Taurus of its assent to the changes made to the printed form. Therefore, the struck portions of

the printed form are not part of the contract between Oppenheimer and Taurus. Oppenheimer

cannot rely on the notice provision of the printed form.

### E.   THE DAILY CONFIRMATION SLIPS AND MONTHLY ACCOUNT STATEMENTS DO NOT REVIVE THE PROVISIONS STRUCK BY TAURUS.

On the back of each confirmation slip and monthly statement is the following

provision:

> It is agreed that all commodity futures transactions made by us for your account
> are made in accordance with the terms of our standard form of commodity trading
> agreement, said terms being incorporated herein by reference, and are made
> subject to Federal and State laws, rules and regulations and to the rules,
> regulations and customs of the exchanges whereon made.

Oppenheimer argues that this provision revives the specific notice provision of its printed form

commodity account agreement even though Taurus struck that provision. Taurus, on the other

hand, argues that this provision merely incorporated the commodity agreement as modified.

Even though a literal reading of the provision would seem to bolster Oppenheimer's position--it

8

speaks of "our standard form" rather than referring to the commodity agreement--it would be inequitable and unreasonable to allow the form language on a confirmation slip to controvert the express agreement of the parties. Whether by virtue of waiver or estoppel, Oppenheimer may not rely upon the language contained on the confirmation slips and statements of account to revive the notice provision of its standard form agreement--it having accepted Taurus's modification of the printed form. Therefore, the written notice provision of Oppenheimer's form commodity agreement was not revived by virtue of the above language contained on the back of the commodity statements and daily confirmation slips.

F.   THERE WAS NO AGREEMENT THAT TAURUS WOULD NOT BE REQUIRED TO NOTIFY OPPENHEIMER WITHIN ANY TIME FRAME.

Taurus has argued that because it struck the notice provision of the agreement, Oppenheimer agreed that Taurus would not be required to notify Oppenheimer of unauthorized trades within any time frame.[4] However, even though the express notice provision was not part of the contract between the parties, that does not necessarily mean that the parties agreed that Taurus would be under no duty to notify Oppenheimer of unauthorized trades in a timely manner. This contract interpretation question will be addressed following the discussion of ratification in order to provide context. For now it is sufficient to note that the court will conclude that the contract between the parties does not allow Taurus unlimited time in which to notify Oppenheimer of unauthorized trades.

---

[4] "As has been established, Oppenheimer and Taurus expressly agreed that Taurus would not be required to comply with any notification requirement." (Taurus's brief in opposition at 39.)

9

III.

## AGENCY LAW AND THE DOCTRINE OF RATIFICATION

### A.   GENERALLY

Even though the notice provision of the printed form was not part of the contract,

Taurus is not relieved from a duty to notify Oppenheimer of disputed trades.  Even in the absence

of an express notice provision, general and longstanding principles of agency law require that a

principal reject unauthorized actions of his agent within a reasonable time or be deemed to have

ratified those actions.

> [W]hen informed by his agent of what he had done, if the principal did not choose
> to affirm the act, <u>it was his duty to give immediate information of his repudiation</u>.
> He cannot, by holding his peace, and apparent acquiescence, have the benefit of
> the contract if it should afterwards turn out to be profitable, and retain a right to
> repudiate if otherwise.
>
> <u>The principal must, therefore, when informed, reject within a reasonable time, or</u>
> <u>be deemed to adopt by acquiescence.</u>

<u>Law v. Cross</u>, 66 U.S. 533, 539, 1 Black 533, 17 L. Ed. 185 (1861)(emphasis added).

> A principal can adopt and ratify an unauthorized act of his agent, ... and when it is
> so ratified it is as if the principal has given an original authority to that effect and
> the ratification relates back to the time of the act which is ratified.  He must
> disavow the act of his agent <u>within a reasonable time</u> after the fact has come to his
> knowledge, or he will be deemed to have ratified it.

<u>Clews v. Jamieson</u>, 182 U.S. 461, 483, 21 S. Ct. 845, 854, 17 L. Ed. 1183 (1901)(emphasis

added).

> The rule that a principal, who does not reject his agent's act <u>within a reasonable</u>
> <u>time</u>, is deemed to have ratified it, is supported by the great weight of authority.

<u>First National Bank of Gainseville v. Biddle</u>, 22 F.2d 11 (5th Cir. 1927)(emphasis added).

It should be noted at this juncture that all three of the above cases hold that the principal would be "deemed" to have ratified the actions of his agent. The use of the word "deemed" demonstrates that the ratification is adjudged to occur regardless of whether or not the principal had the specific intent to ratify the trade. It arises by operation of law in such situations whether or not the principal subjectively intends to ratify his agents actions.

The principles set forth in these cases have been adopted by the Restatement (Second) of Agency. Section 82 sets forth the definition of "ratification."

> Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.

Affirmance is defined in Section 83 as follows:

> Affirmance is either
>
> (a) a manifestation of an election by one on whose account an unauthorized act has been done to treat the act as authorized, or
>
> (b) conduct by him justifiable only if there were such an election.

(Emphasis added). Section 94 provides that "[a]n affirmance of an unauthorized transaction can be inferred from a failure to repudiate it." (Emphasis added). Furthermore, Comment A to Section 95 illustrates that inaction may constitute an affirmance: "Thus, his affirmance may be shown by the fact that after knowing of the transaction he did nothing, if the circumstances are such that he could reasonably have been expected to dissent unless he were willing to be a party to the transaction."

11

## B.   RATIFICATION IN COMMODITY TRADING CASES

The doctrine of ratification has long been applied in commodity trading situations. In <u>Leviten v. Bickley, Mandeville & Wimple, Inc.</u>, 35 F.2d 825, 827 (2d Cir. 1929), the court noted that ratification may arise "by implication from the principal's acquiescence or failure to dissent within a reasonable time after being informed by the agent of what he has done...." (citing <u>Law v. Cross</u>).  In <u>Leviten</u>, the broker executed an unauthorized trade in closing out an open position on September 28th.  Leviten, the customer, became aware of the unauthorized trade the following day and attempted to have the position reinstated through discussions with the broker. However, these efforts failed and reinstatement was refused on October 7th.[5]  Although the actual date of receipt by Leviten of written confirmation was in dispute, he acknowledged it was received no later than October 20th.  As the court noted:

> The confirmation slip ... gave Leviten (if he did not already have it) full information as to the items charged against his account by reason of the broker's covering purchase.  Still Leviten said nothing.  He remained silent until December 18th, when he started suit.  Thus for more than nine weeks after October 7th he gave no intimation whether he would ratify or repudiate the unauthorized act of his agent.

35 F.2d at 827.  The court explained the policy behind requiring prompt notification by the principal when he intends to repudiate an unauthorized trade.

> The situation was one where delay by the principal in deciding on his course of conduct, if permitted by the law, would give him the benefit of a change in the market if it moved in his favor, and put the loss on the agent if it went against him.

---

[5]  The court pointed out that even though Leviten may have informed the broker that the September 28th trade was unauthorized during the negotiations in early October, he had not made clear whether or not he would ratify it.  The court noted that "[m]erely saying that an act was unauthorized does not amount to a repudiation, or prevent a subsequent ratification."  35 F.2d at 827.

35 F.2d at 827.  The court noted that ordinarily the question of ratification would be for the jury.

However, it found that "the plaintiff's delay in expressing his intent to repudiate was so long

continued that a contrary verdict would have had to be set aside." 35 F.2d at 829.

      A more recent illustration of the above principles is found in <u>Jaksich v. Thomson</u>

<u>McKinnon Securities, Inc.</u>, 582 F. Supp. 485 (S.D.N.Y. 1984).  In that case the court explained

the doctrine of ratification as follows:

> Ratification is a theory of agency in which a principal adopts a previous action
> performed by an agent in the principal's name, but which prior action would not
> bind the principal absent the ratification because the act as originally done was
> without authority....  For example, assume Investor instructs Broker-Dealer to
> purchase 100 shares of Acme Corporation stock for a total purchase price of
> $10,000.  Instead of buying Acme's stock, as ordered, Broker-Dealer purchases
> 100 shares of Beta Corporation stock for a total price of $15,000.  <u>When Investor</u>
> <u>receives the confirmation slip two choices are open: (1) immediately disclaim the</u>
> <u>transaction as being unauthorized; or (2) elect to ratify the transaction, in which</u>
> <u>instance the previously unauthorized action of Broker-Dealer becomes ratified</u>....

582 F. Supp. at 496 (footnote omitted)(emphasis added).

### C.   THE RATIONALE BEHIND REQUIRING SWIFT NOTICE OF REPUDIATION IN COMMODITY TRADING CASES

      It is important to understand the rationale behind the stringent rules regarding

notice of unauthorized commodity trades.  Commodity trading is regulated by the Commodity

Futures Trading Commission ("CFTC"), and as such, that body has peculiar expertise in matters

relating to commodity trading.  It is thus important to note the position of the CFTC on the

matter of early notification of allegedly unauthorized trades.  In <u>Sherwood v. Madda Trading</u>

<u>Company</u>, 1979 WL 11487 (CFTC 1979), the Commission set forth its views concerning the

interrelated rights and duties of the broker and customer in cases of unauthorized trading.

13

In aid of its analysis of the question raised here, the Commission would
like to clarify its views concerning the interrelated rights and duties which arise
when a customer believes that trades have been made in his account without his
authorization. Principal among these is the customer's absolute right not to incur
liability for any trade not authorized by him. In other words, if a transaction is
executed without proper customer authorization, the position belongs to the
futures commission merchant, not the customer.

1979 WL at *3 (footnotes omitted). This is the bedrock underlying rules requiring timely

notification to the broker in commodity trading situations. Because the unauthorized trade

belongs to the broker, he must be given timely notice of unauthorized trades so that he may

minimize any loss. As the Commission explained:

Complaining to the responsible officer or agent of one's futures commission
merchant is, in the Commission's view, the mandatory first step which a customer
must take to mitigate damages upon discovery of unauthorized trading. The
rationale behind this rule is simple. A substantiated complaint to a broker would
immediately remove the burden of the unauthorized activity from the customer
and give the person or entity with ultimate legal and financial responsibility for
the trade an early opportunity to close the unauthorized position according to his
own market theory or trading policy. By not complaining at the first reasonable
opportunity, a customer, in effect, usurps the proper role of the persons ultimately
responsible for the trade, the futures commission merchant and its officers and
agents. Moreover, by failing to protest, the broker would undoubtedly presume
the regularity of the unprotested transactions and knowingly forego potential
opportunities to liquidate the positions. In the Commission's view, any
aggravation of damages occurring as the result of a customer's undue silence
should not be passed on to the futures commission merchant.

1979 WL at *5 (footnotes omitted)(emphasis added). The Commission summed up its

reasoning:

Given the principle underlying our holding here--that trades made without
customer authorization belong to the futures commission merchant, not the
customer--[the customer's] silence, together with his continued trading, placed
[the customer] in a position whereby he was trading against positions in his
account which belonged to [the broker], but without [the broker] either knowing
of the unauthorized nature of the trades or consenting to or acquiescing in [the
customer's] trading strategy. If we are to place ultimate responsibility for

14

unauthorized trades upon futures commission merchants, we must also give
assurance that they will have the opportunity to assert control over such trades and
extricate themselves from the market <u>at the first reasonable opportunity</u>.

This will assure that customers cannot take advantage of mistakes by
associated persons or other employees of futures commission merchants and use
unauthorized or mistaken trades as a means to play the market with impunity,
only repudiating the trades in question if they finally become losing propositions.

1979 WL at *6-7 (emphasis added).[6]

IV.

## A DIGRESSION TO CONSIDER TAURUS'S CONTENTION THAT THE CONTRACT EXPRESSLY RELIEVED THEM FROM ANY DUTY TO NOTIFY OPPENHEIMER WITHIN ANY LIMITED TIME FRAME

As noted above, Taurus argues that because the notice provisions were struck

from the agreement, the parties had contractually agreed that Taurus would not be required to

notify Oppenheimer of unauthorized trades within any limited time period.  The above

discussion of the policy considerations underlying the doctrine of ratification in commodity

------

[6] The Commission in <u>Sherwood</u> based its decision on the doctrine of equitable estoppel
rather than ratification.  The Commission, set forth the elements of that defense as follows:

(1) The party to be estopped must know the facts; (2) he must intend that his
conduct shall be acted on or must so act that the party asserting the estoppel has a
right to believe it is so intended; (3) the latter must be ignorant of the true facts;
and (4) he must rely on the former's conduct to his injury.

Formulated in this manner, equitable estoppel is very similar to the ratification doctrine as
applied in commodity trading situations, except that elements three and four are not required
under the ratification doctrine.  The court is of the opinion that the same policy rationale
underlies the requirement that notification be swift in ratification situations.  Therefore, even
though the Commission based its decision on estoppel, its reasoning is relevant to a
consideration of whether Taurus's delay in notifying Oppenheimer should be deemed a
ratification of the disputed trades.

trading situations makes clear that it would be unreasonable to interpret the contract between Oppenheimer and Taurus as allowing Taurus an indefinite period of time in which to notify Oppenheimer of unauthorized trades. Taurus could not reasonably have expected that by accepting the commodity agreement as modified, Oppenheimer was manifesting its assent to such a proposition. Taurus was without doubt aware of the volatile nature of commodity markets--that volatility being a major reason Taurus engaged in futures trading.[7] Taurus, therefore, could not reasonably have believed that Oppenheimer would agree to give an unlimited amount of time for Taurus to notify it of unauthorized trades. The contract was simply silent as to a specific time limit. It did not constitute an agreement that Taurus would be given unlimited time to notify Oppenheimer of unauthorized trades.

V.

APPLICATION OF THE PRINCIPLES OF AGENCY LAW TO<br>THE INSTANT CASE

A.

The above discussion of the doctrine of ratification cannot be summarized with more clarity than was done in 1861 by the Supreme Court in Law v. Cross: "The principal must, therefore, when informed, reject within a reasonable time, or be deemed to adopt by acquiescence." 66 U.S. at 539. In commodity trading situations, this means that a customer must upon receiving a daily confirmation of trades containing unauthorized trades, either notify his broker within a reasonable time or be deemed to have ratified those trades. Jaksich, 582 F.

---

[7] "As a producer, its goal in futures trading is merely to lock in the sale price of its future production. In other words, Taurus does not speculate in the futures markets, but seeks only to protect itself against oil and natural gas price volatility." (Taurus's brief in opposition at 4.)

16

Supp. at 496. In the instant case, Taurus does not dispute that it received the daily confirmation slips sent by Oppenheimer in a timely fashion. Holley LaGrone, the person at Taurus who received the daily confirmation slips, testified that they were received within a day or two of the date they were generated. (LaGrone Depo. at 64.) Taurus was under an affirmative duty to review the daily confirmation slips to ensure their accuracy. To hold otherwise would upset the balance of responsibilities that exists between the broker and customer in the commodity trading business. Taurus is not an unsophisticated investor. It cannot reasonably assert that it was unable to discover unauthorized trades by reviewing the daily confirmation slips. In fact, Walt McMahon testified that any inconsistencies could have been discovered by reviewing the daily confirmation slips. (McMahon Depo. at 301.) Therefore, cases discussing the need for a flexible standard concerning the customer's duty to give notice upon receiving confirmation slips are not applicable.

### B.

On the back of each confirmation slip and monthly statement are various terms governing trades executed on Taurus's behalf. The last paragraph is as follows: "Please note the entering of another order to buy or sell the same contract at another price does not automatically cancel a previous open order. Any error must be reported to us immediately by telephone." (Emphasis added). Because it is contained in the paragraph concerning the closing of open positions, this requirement that any error must be reported immediately might be read as applying only to situations involving orders for duplicate contracts at a different price. However, it at a minimum means that Taurus was on notice that it should review the confirmation slips and

monthly statements for errors involving those types of trades. This should have also alerted Taurus of the need for immediate notification of unauthorized trades.

Because Taurus had a nondiscretionary account, it would have been a relatively simple matter to check the daily confirms to ensure that only those trades directed by Taurus were executed.[8] Taurus's argument that it was entitled to rely upon the verbal confirmations of trades made by Knochel, the Oppenheimer representative who serviced Taurus's account, is unavailing. Had Taurus reviewed the daily confirmation slips, it would have been aware of any discrepancies between the verbal report of trades and the trades actually charged to its account. It cannot, therefore, have reasonably relied upon the verbal reports of Knochel, once a daily confirmation slip had been received. No reasonable jury could find such reliance to have been reasonable. For this reason, Taurus must be charged with constructive knowledge of the allegedly unauthorized trades upon receipt of the daily confirmation slip noting each such trade. Therefore, Taurus was required to notify Oppenheimer of any unauthorized trades within a reasonable time after receiving the daily confirmation slip noting such trade or be deemed to have ratified the disputed trade.

Although there can be no absolute rule, in commodity trading situations a reasonable time would be measured in days rather than weeks or months. As has been noted, unauthorized trades belong to the broker. In order to afford the broker a meaningful opportunity to close out the unauthorized trade and thereby reduce any potential loss, notice of errors must be

---

[8] With discretionary trading accounts, it would be more difficult for even a sophisticated customer to determine whether the trades made at the discretion of the broker exceeded the broker's authority.

swift. There is no evidence in the record indicating Taurus notified Oppenheimer of any

unauthorized trades within a reasonable time.

### C.

Taurus asserts that it complained in October about trades involving August 1996

oil and gas futures contracts. Those trades as set out in Taurus's complaint are as follows:

> 10 August 1996 crude oil contracts sold on June 26, 1996, and purchased on
> September 19, 1996.

> 20 August 1996 natural gas contracts sold on July 23, 1996, and purchased on
> July 18, 1996.[9]

The earliest of those trades occurred on June 26, 1996, and the latest occurred on

July 23, 1996.[10]  Walt McMahon prepared a memo to file on October 24, 1996.  This memo

recited the events that had occurred in September and October of 1996 relating to the

discrepancies Taurus had noticed between its records and the confirmation slips and account

statements it had received from Oppenheimer.  In that memo he states that he was first advised

on October 9, 1996, of a potential discrepancy in the gain/loss numbers between those reflected

in Taurus's internal reports and the monthly account statements Taurus received from

Oppenheimer.  The memo indicates McMahon called Knochel on October 11, 1996, and told him

---

[9] These trades are set out in Taurus's complaint as two lots of 10 contracts.

[10] It should be noted that each allegedly unauthorized "trade" actually consists of two
separate transactions--a sale and a purchase.  Since Taurus alleges that both sides of the
transaction were unauthorized (rather than alleging that open positions were closed out without
authorization) the earlier of the two transactions (whether a sale or a purchase) should have
alerted Taurus to the fact that an unauthorized trade had been executed.  It would not be
necessary for Taurus to await the second transaction in order for it to know that an unauthorized
trade had taken place.  Therefore, Taurus's obligation to object was triggered upon receipt of the
daily confirmation slip noting the earlier of the two transactions.

that Taurus was having problems reconciling the gain or loss on the monthly account statements with Taurus's internal futures report. Therefore, in excess of two months elapsed before Taurus notified Oppenheimer that it disputed the latest of these allegedly unauthorized trades, which was executed on July 23, 1996. As a matter of law two months is not notification within a reasonable period of time. Therefore, the principles of agency law as applied in the context of commodity trading require that Taurus be deemed to have ratified those trades.

D.

The only other instance that might conceivably constitute a timely notification of unauthorized trades occurred in September 1996, and involved the total number of September 1996 oil and gas contracts shown as closing out on the August account statement. The above noted memo to file by McMahon indicates that he called Knochel sometime in September 1996, to inquire as to this discrepancy. The discrepancy amounted to an extra five crude oil contracts and an extra ten natural gas contracts. These contracts arise from the following unauthorized trades identified in Taurus's complaint:

5 September 1996 natural gas contracts sold on July 20, 1996, and purchased on August 7, 1996.

5 September 1996 natural gas contracts sold on August 18, 1996, and purchased on August 19, 1996.

5 September 1996 crude oil contracts sold on August 8, 1996, and purchased on August 7, 1996.

Therefore, the latest of these trades occurred on August 19, 1996, and the earliest on July 20, 1996. Allowing for the receipt of the daily confirmation slips in the normal time frame, Taurus waited a minimum of two weeks before notifying Oppenheimer of these alleged discrepancies. Again, as a matter of law, this was not notice of an objection within a reasonable time.

20

Additionally, it should be pointed out that the McMahon memo does not indicate that Taurus ever identified a specific trade that it questioned in September 1996. Taurus only questioned the total number of contracts shown on the Oppenheimer monthly account statement for August 1996. This would not in any event represent a manifestation of intent to reject any specific trade. See, Leviten, 35 F.2d at 828 ("Merely saying that an act was unauthorized does not amount to a repudiation, or prevent a subsequent ratification.").

E.

It must also be noted that in addition to the specific trades discussed above, which were the subject of discussions in September and October of 1996, Taurus also alleges that unauthorized trades were made as early as January 3, 1996. That Taurus failed to notify Oppenheimer of its objection to these trades for nine months is important, not only with respect to those early trades, but with respect to the later trades as well. It is hypothetically possible, assuming the trades were in fact unauthorized, that Knochel and others in authority at Oppenheimer were not aware of that fact. Unauthorized trades might conceivably be charged to Taurus's account as a result of errors on the part of persons not employed by Oppenheimer. Because Taurus never notified Oppenheimer of the disputed trades, Oppenheimer would not have had the opportunity to discover the source of the mistakes or to take steps to prevent their reoccurrence. See, Sherwood, 1979 WL at *6-7 (discussing the possibility that the broker would be unaware of unauthorized trades that resulted from the actions of others). Therefore, it is important to note that Taurus remained silent for nine months before alerting Oppenheimer of the allegedly unauthorized trades. Had Taurus notified Oppenheimer that it had not authorized the trades in January 1996, it is quite possible Oppenheimer could have taken steps to ensure that no additional unauthorized trades were made.

F.

Therefore, on the issue of whether Taurus, through its silence, must be deemed to have ratified the allegedly unauthorized trades that form the basis of its complaint, there exists no genuine issue of material fact. No reasonable jury could find that any notification by Taurus with respect to any of the allegedly unauthorized trades was within a reasonable period of time after Taurus had constructive knowledge of the disputed trades through receipt of the daily confirmation slips.

G.

Taurus's contends that Knochel admitted that the 20 August 1996 natural gas contracts purchased on July 18, 1996, and sold on July 23, 1996, (these are the same contracts discussed above) were due to Oppenheimer's error. It argues that this establishes wrongdoing on the part of Oppenheimer. Before turning to the effect of the deemed ratification by Taurus of the disputed trades, this issue should be considered. The contemporaneous memo to file of McMahon recounts the incident as follows:

> On Wednesday, October 16th, Bill Knochel called me and said he had found the problem with natural gas in August 96 and it was his mistake. He said the problem was caused by "those 20 contracts". He said he owed us over $40,000 and would make sure we got paid. However, he couldn't ask Oppenheimer to credit our account for this difference since "they don't understand my business and if they see a $40,000+ problem on a 20 contract deal, they would wonder what magnitude of problem might occur on a 200 or 300 contract deal. He surmised that he could possibly lose his relationship with Oppenheimer if he asked them to credit us back the $40,000+. Instead, Bill suggested that we set up a receivable on our books and reduce it over time as he waived our future commissions until the debt is paid.[11]

---

[11] It should be noted that Knochel disputes McMahon's account of their discussions on this point.

This at best indicates that the loss was the result of a mistake on the part of Oppenheimer and not that anyone at Oppenheimer intentionally engaged in unauthorized trading. It does not in any way suggest that Knochel admitted that he, or anyone else at Oppenheimer, had intentionally executed unauthorized trades.

H.

Also warranting discussion is Taurus's argument that it was misled by Knochel on two occasions in the fall of 1996. Taurus suggests that it was misled by Knochel who, it is alleged, offered false explanations of trading discrepancies in September and October 1996. These alleged misrepresentations are offered as evidence that the trades were in fact unauthorized (Taurus's brief in opposition at 8), and also in support of its fraud claims (Taurus's brief in opposition at 21)("Knochel, on behalf of Oppenheimer, knowingly tried to conceal the fact of an unauthorized trade by providing Walt McMahon with a false explanation for a discrepancy on a monthly statement. As a result, Oppenheimer had a duty to disclose to Taurus which trades were authorized and which were unauthorized.") In the context of whether Taurus ratified the disputed trades, it must be noted that the allegedly false explanation occurred during September and October of 1996, and involved trades that occurred well prior to that time. At the time the alleged misrepresentations were made, Taurus had already waited too long to notify Oppenheimer of the disputed trades. Therefore, any misrepresentation at that time would be irrelevant to the issue of whether Taurus must be deemed to have ratified those trades by its silence.

23

VI.

### THE EFFECTS OF TAURUS'S DEEMED RATIFICATION OF THE DISPUTED TRADES

The effect of ratification by the principal of a previously unauthorized act of his agent is set forth in Section 82 of the Restatement (Second) of Agency. Section 82 provides that upon ratification, the unauthorized act is given effect as to some or all persons as if originally authorized by the principal. See Also, Clews, 182 U.S. at 483 ("it is as if the principal has given an original authority ... and the ratification relates back to the time of the act which is ratified."). Section 416 governs the liability of the agent to the principal in cases of ratification or affirmance and provides as follows:

> The ratification or other affirmance by the principal of an unauthorized act done by an agent acting in excess of his power to bind the principal releases the agent from liability in damages to the principal for having violated a duty to him, except when the principal:
>
> (a) is obligated to affirm the act in order to protect his own interests; or
>
> (b) is caused to ratify by the misrepresentation or duress of the agent.[12]

All of Taurus's claims, with the possible exception of its fraud count,[13] arise out of the allegedly unauthorized trades. Taurus's claims for breach of contract, conversion, breach of fiduciary duty, and violation of the Commodities Act all depend upon a finding that the trades were

---

[12] This exception will be discussed further in connection with Taurus's fraud claims. For now it suffices to note that the court will conclude Taurus has not created a genuine issue of fact on the issue of Oppenheimer having induced it to ratify the disputed trades through misrepresentation or duress.

[13] The court will consider Taurus's fraud allegations below.

24

unauthorized.  If the trades, because of Taurus's deemed ratification, are treated as if they were authorized at the time they were executed, each of those claims fails.[14]

## VII.

## TAURUS'S FRAUD CLAIMS

Taurus's fraud claims are a different matter.  Taurus alleges that Oppenheimer reported unauthorized trades to Taurus as authorized trades--presumably because they did not identify the trades as unauthorized on the statements.  Taurus alleges it relied upon these misrepresentations to its detriment.  Taurus also alleges that Oppenheimer suppressed the fact that it was making unauthorized trades.

## A.

Taurus's active fraud claim is based upon the representations made by Knochel in the fall of 1996 in response to Taurus's inquiries concerning discrepancies in its account.  Taurus alleges that Knochel provided false explanations for these discrepancies.  As noted above, these alleged misrepresentations occurred after Taurus had waited too long to repudiate the trades.  They are thus irrelevant on the issue of whether Taurus must be deemed to have ratified the trades.  Therefore, Taurus has pointed to no evidence that it was damaged as a result of its reliance upon the alleged misrepresentations.  For these reasons, no genuine issue of fact exists as to Taurus's active fraud claims.

---

[14] Regarding the Commodities Act claim see Robertson v. Clayton Brokerage Co. of St. Louis, 587 F. Supp. 678, 684 (N.D.Ga. 1984)("His failure to repudiate the transaction constituted a ratification, which is a complete defense to his claim of a statutory violation.")(quoting McManus v. Siegel Trading Co., (1977-80 Tr. Binder) Com. Fut. L. Rep. (CCH) ¶ 20,551, p. 20, 264 (1978)).

B.

Taurus's claim of suppression rests upon an alleged duty on the part of Oppenheimer "to disclose to Taurus which trades were authorized and which were unauthorized." (Taurus's brief in opposition at 21.) This duty is supposed to arise due to the fact that Knochel called McMahon and verbally confirmed the execution of the trades McMahon had placed. Taurus argues that this induced it to rely on these verbal confirmations. The fatal flaw in Taurus's suppression claim is that any reliance by Taurus on Knochel's verbal confirmations would not be reasonable after it received the daily confirmation slip that listed each of the disputed trades. Taurus knew which trades it authorized. Accordingly, it must be charged with the knowledge that any trades, other than those that it authorized, were unauthorized. It cannot, therefore, after receiving a daily confirmation slip claim to have been ignorant of the facts allegedly suppressed by Oppenheimer. As a result, it could not have been harmed by the alleged suppression by Oppenheimer. For these reasons, no genuine issue of fact exists as to Taurus's fraud claims and Oppenheimer is entitled to a judgment as a matter of law on those claims.

C.

The court notes that policy considerations weigh against finding that by making verbal confirmations of trades, a broker is exposed to greater potential liability than if it only issued written confirmations. The CFTC has expressed its opinion that oral confirmations by telephone should be encouraged.

> We note that it would actually be in their own best interest for all futures commission merchants, where possible, to confirm all transactions orally or by telephone immediately after execution on the floor. Many houses have already adopted this practice out of a realization that it protects the futures commission merchant as well as the customer.

26

Sherwood, 1979 WL at *13, F.N. 15 (emphasis added). If customers are allowed to prevail on fraudulent suppression claims merely because they relied on the verbal confirmations to the exclusion of reviewing the written confirmations of trades, brokers may be discouraged from providing such oral confirmations. This would remove an important safeguard for both the customer and the broker. If unauthorized trades are discovered and reported within minutes of the trade, the broker will be able to rectify the problem before potential losses mount. If unauthorized trades are not discovered until the customer receives the written confirmation, oftentimes losses will already be great. Therefore, policy grounds also support finding against Taurus on its suppression claim.

## VIII.

## THE MOTIONS TO STRIKE

In addition to the motion for summary judgment, various motions to strike have been filed. Taurus filed a motion to strike the expert report of Michael D. Weiner. Oppenheimer has conceded that the report cannot be used for the purposes of the pending motion for summary judgment. The court has not considered that report and, therefore, the motion is moot.

Oppenheimer has moved the court to strike Taurus's supplemental submission in opposition to summary judgment and the supplemental affidavit of John David Woodruff. The supplemental Woodruff affidavit was not relied upon by the court in its ruling, and, therefore, the motion as to the affidavit is moot. The court will deny the motion as it relates to the supplemental brief submitted by Taurus. The court considered both parties supplemental briefs.

Oppenheimer also has moved the court to strike the affidavit of Walter McMahon. Taurus has agreed that certain portions of the affidavit may be struck. The remainder of the affidavit is irrelevant to the court's ruling. It was only necessary for the court to consider

27

McMahon's deposition testimony in its ruling. For these reasons, the court is of the opinion that the motion is moot.

IX.

CONCLUSION

Because Taurus must be deemed to have ratified each of the disputed trades, those trades must be treated as if they had been authorized in advance. Therefore, Taurus cannot assert that Oppenheimer breached any contractual or fiduciary duties based upon the execution of those trades. Nor can Taurus assert that Oppenheimer is liable for conversion based upon those claims--conversion being an unauthorized use of another's property. As to Taurus's fraud claims, Taurus has not introduced a genuine issue of fact on either its active fraud claims or its suppression claims. Any fraud claims based upon the mere fact that Oppenheimer allegedly engaged in unauthorized trades is precluded by Oppenheimer's successful defense of ratification. Taurus's suppression claim is also without merit--it being charged with constructive knowledge of the facts allegedly suppressed. Therefore, as to each of Taurus's claims, there exists no genuine issue of fact and Oppenheimer is entitled to a judgment as a matter of law.

An appropriate order will be entered contemporaneously herewith.

DONE and ORDERED this 17th day of April 1998.

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.